LAW OFFICES OF DAVID M. FELDMAN
DAVID FELDMAN, SBN #179679
100 Wilshire Blvd., Suite 940
Santa Monica, California  90401
Telephone: (310) 578-7171
Facsimile: (310) 578-7731

Attorney for Plaintiff
LINDA TURNER

# UNITED STATE DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA TURNER INDIVIDUALLY AND ON BEHALF OF KEVIN TURNER (DECEASED), <br><br> Plaintiff, <br><br> vs. <br><br> LINDA PERSONS, GARY CECIL, HEIDI COOKS, ERIKA COOKS, COLLEEN GARREN, JEAN DANSEREAU, JOSEPH MORROW, BARBARA VANHOOSE, SARAH FAIN, GEORGIA CASSIDY, CARRIE FRIEND, DENISE THOMPSON, AND DOES 1 to 20 INCLUSIVE, <br><br> Defendants. | CASE: <br><br> **COMPLAINT** <br><br> 1.  VIOLATION OF 42 U.S.C. §1983; <br><br> 2. ADULT DEPENDENT ABUSE <br><br> 3.  WRONGFUL DEATH <br><br> JURY DEMANDED |

Plaintiff Linda Turner ("Plaintiff") individually and as Decedent Kevin Turner's ("Decedent") surviving heir and successor-in-interest under CCP § 377.11 for  the Complaint against Defendants LINDA PERSONS, GARY CECIL, HEIDI COOKS, ERIKA COOKS, COLLEEN GARREN, JEAN DANSEREAU, JOSEPH MORROW, BARBARA VANHOOSE, SARAH FAIN, GEORGIA CASSIDY, CARRIE FRIEND, DENISE THOMPSON,  AND DOES 7 TO 10, AND 17 TO 20, (collectively "Defendants") alleges as follows:

— 1 —

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

**Venue**

1. The claims alleged herein arose at ATASCADERO STATE HOSPITAL ("ASH"), which is located at in the County of San Luis Obispo, State of California.

**Identify of Plaintiff and Decedent**

2. Plaintiff Linda Turner was and is a resident of Tacoma, State of Washington.

3. Plaintiff is the sole successor-in-interest of Decedent and succeeds to these causes of action because there is no personal representative of the Estate of Decedent. Plaintiff brings this complaint in the capacity of successor-in-interest and in her own interest. Plaintiff has executed and filed the affidavit required by Code of Civil Procedure Section § 377.32 and the Court has signed an Order stating that for the purposes of this litigation she is Decedent's successor-in-interest.

4. Plaintiff is also the mother of Decedent.

5. Decedent suffered from a mental disease, which restricted Decedent's ability to carry out normal activities to protect his rights.

6. Decedent, a fifty-three (53) year old male suffering from mental limitations, was being cared for at ASH, a state psychiatric facility charged with the care of Decedent. At all relevant times herein, Decedent was a "dependent adult" as defined by Welf & Inst Code § 15701.15. At all times relevant to this action, Defendants were responsible for the care and custody of Decedent in that he was a ward of ASH, an acute and intermediate inpatient psychiatric facility.

7. Decedent married Linda Kay Smith on November 1, 1998. Ms. Smith died on February 25, 2004. Her date of birth was September 5, 1947. They did not have any children.

**Identity of Defendants**

— 2 —

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

8.      This is an action against the Defendants for violations of 42 U.S.C. §1983, for Abuse of a Dependent Adult and Wrongful Death, which were the proximate causes of Decedent's death.

9.      Plaintiff is informed and believes and thereby alleges that at all times relevant hereto Defendant LINDA PERSONS was the Executive Director at ASH.  Upon information and belief Defendant PERSONS was and is a resident of San Luis Obispo County.

10.      Defendant GARY CECIL was a senior psychiatric technician who worked on Unit 26, and he was the AM shift lead.  He no longer works at ASH.  He was and is a resident of San Luis Obispo, California.  At all relevant times, CECIL had direct responsibility for the care and treatment of Decedent while he was a patient at ASH.

11.      Defendant HEIDI COOKS, is a psychiatric technician who currently works at ASH.  At the time of the events in question in this lawsuit she was assigned to the AM shift on Unit 26.  She was and is a resident of San Luis Obispo, California.  At all relevant times, COOKS had direct responsibility for the care and treatment of Decedent while he was a patient at ASH.

12.      Defendant ERIKA COOKS, is a psychiatric technician who currently works at ASH.  At the time of the events in question in this lawsuit she was assigned to the AM shift on Unit 26.  She was and is a resident of San Luis Obispo, California.  At all relevant times, COOKS had direct responsibility for the care and treatment of Decedent while he was a patient at ASH.

13.      Defendant COLLEEN GARREN, currently works at ASH.  At the time of the events in question in this lawsuit she was the Unit Supervisor of Unit 26.  She was and is a resident of San Luis Obispo, California.   At all relevant times, GARREN had direct responsibility for the care and treatment of Decedent while he was a patient at ASH.

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

14.     Defendant JEAN DANSEREAU, is a psychiatrist licensed to practice in the State of California.  At the time of the events in question in this lawsuit he was the Unit Psychiatrist for Unit 26.  He no longer works at ASH.  He was and is a resident of San Luis Obispo, California.  At all relevant times, DANSEREAU had direct responsibility for the care and treatment of Decedent while he was a patient at ASH.

15.     Defendant JOSEPH MORROW, is a psychologist licensed to practice in the State of California.  At the time of the events in question in this lawsuit he was the Unit Psychologist for Unit 26.  He no longer works at ASH.  He was and is a resident of San Luis Obispo, California.  At all relevant times, MORROW had direct responsibility for the care and treatment of Decedent while he was a patient at ASH.

16.     Defendant BARBARA VANHOOSE, is a registered nurse licensed to practice in the State of California.  At the time of the events in question in this lawsuit she was a staff RN assigned to Unit 26.  She was and is a resident of San Luis Obispo, California.  At all relevant times, VANHOOSE had direct responsibility for the care and treatment of Decedent while he was a patient at ASH.

17.     Defendant SARAH FAIN, is a psychiatric technician who currently works at ASH.  At the time of the events in question in this lawsuit she was assigned to the AM shift on Unit 26.  She was and is a resident of San Luis Obispo, California.  At all relevant times, FAIN had direct responsibility for the care and treatment of Decedent while he was a patient at ASH.

18.     Defendant GEORGIA CASSIDY, is a psychiatric technician who currently works at ASH.  At the time of the events in question in this lawsuit she was assigned to the AM shift on Unit 26.  She was and is a resident of San Luis Obispo, California.  At all relevant times, CASSIDY had direct responsibility for the care and treatment of Decedent while he was a patient at ASH.

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

19.     Defendant CARRIE FRIEND, was the Program Director for Program 7, at the time of the events in question in this lawsuit.  She currently works at ASH.  She was and is a resident of San Luis Obispo, California.  At all relevant times, FRIEND had direct responsibility for the care and treatment of Decedent while he was a patient at ASH.

20.     Defendant DENISE THOMPSON, was the Health Service Specialist assigned to Program 7, at the time of the events in questions in this lawsuit.  She no longer works at ASH. She was and is a resident of San Luis Obispo, California.  At all relevant times, THOMPSON had direct responsibility for the care and treatment of Decedent while he was a patient at ASH.

21.     Doe Defendants 7 to 10, were at all times relevant hereto to medical staff who cared for and treated Decedent and AC, including the psychiatrists, psychologists, registered nurses, social workers, rehabilitation therapists, licensed vocational nurses, and psychiatric technicians either assigned to Decedent's unit or who were simply responsible for the care of Decedent.  Doe Defendants 1 to 10 are being sued in their individual capacity.

22.     Doe Defendants 11 to 20 are the other various supervisors who had supervisory responsibility over the staff that was charged with the care and safety of Decedent.  Does 11 to 20 are being sued for their direct reckless indifference, in their individual capacity and not vicariously.

23.     The true names and capacities of the Defendants named herein as Does 1 to 10 and 11 to 20, inclusive, whether individual, corporate, associate, or otherwise, are unknown to Plaintiff, who therefore sues such defendants by fictitious names pursuant to Code of Civil Procedure § 473 and § 474.  Plaintiff is informed and believes that said Doe defendants are California residents, and Plaintiff will amend this Complaint to show such true names and capacities when they have been determined.

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

24.     At all times mentioned herein, each and every Defendant and Does 1 to 10 and Does 11 to 20 was the agent and employee of each and every other Defendant; and, in doing the things alleged, was acting within the course and scope of such agency and employment; and, in doing the acts herein alleged, was acting with the consent, permission and authorization of each of the remaining Defendants.  All actions of each Defendant and Does 1 to 10 and Does 11 to 20 herein alleged were ratified and approved by the officers or managing agents of every other defendant.

25.     Plaintiff is informed and believes, and thereby alleges, that each of the Defendants and Does 1 to 10 and Does 11 to 20 herein were at all times relevant hereto to the agent, managing agent, employee or representative of the remaining Defendants and was acting at least in part within the course and scope of such relationship.

26.     Defendants and Does 1 to 10 and Does 11 to 20 are legally responsible, in whole or in part, for the operation of ASH and for the health and safety of the persons residing in ASH.  ASH is an institution within the meaning of 42 U.S.C. § 1997(1).  ASH provides care to psychiatric patients committed civilly or in connection with criminal proceedings.

27.     Defendants and Does 1 to 10 and Does 11 to 20  are obligated to operate ASH in a manner that does not infringe upon the federal rights, as protected by the Fourteenth Amendment to the Constitution of the United States and by other federal law, of individuals confined to the Facilities.

### Statement of Facts

28.     On May 28, 2014 at about 2:07 pm, AC (a former patient at Atascadero State Hospital), 34, 6 feet, 8 inches, lay on top of his roommate, Decedent, and strangled him to death.

**AC's History of Violence:**

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

29.     AC was admitted to ASH on March 6, 2014 and transferred to Unit 26 less than a month before the incident in question.  AC, a convicted felon for attempted rape and assault, had a documented history of violent and disturbing behavior involving religious and sexual delusions. On Feb 15, 2012 he argued with his mother, he then threw to hammers at his brother and used a rock to vandalize tow vehicles owned by his mother.  He was found guilty of assault by means likely to produce great bodily injury.  He was classified as a Mentally Disordered Offender ("MDO") — one of the most violent categories a patient can have within the State Department.  AC's diagnoses included psychosis and paranoia.

30.     Upon admission to ASH AC was unstable and required multiple interventions. He had numerous behavioral difficulties since admission.  He was repeatedly entering other patients' rooms and stealing things.  He had episodes of screaming at God whom he believed was talking to him.  On March 7, 2014 he was stating, "I am the anti-Christ.  God gave me power and "I'll kill you all.  I will kill staff.  I will kill you in your sleep.  I worship Satan.  I will get you when you are not looking."  On March 11, 2014 he was involved in an incident with a peer in which he ripped a mirror off the wall and attempted to hit him with it.  He was placed in restraints.  On March 22, 2014 and March 26, 2014 he was involved in altercations with a peer. He was placed in restraints.

31.     On April 1, 2014 staff responded to the sound of a commotion in the patient bathroom.  A peer was found on the floor of the bathroom when AC was seen exiting the bathroom.  AC appeared tense and agitated and was breathing heavily.  He was told to face the wall and was escorted to room seclusion.  During the initial interview AC denied he had been involved in an altercation.  Then during an interview with the psychiatrist he admitted that he had hit the peer several times.  He was counseled on his aggressive behavior.  AC received

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

individual therapy with the unit psychologist. The Hospital Police Department recommended that AC be on a rotation on the locked units. AC was enrolled in Aggression Reduction group.

32.    On April 2, 2014 a peer reported to staff that he the peer struck AC 10 times while in the bathroom. AC told staff that he slipped on soap. AC said that he continues to get into trouble so that he can stay at the hospital because he does not want to be discharged to the street. AC said that he does not want to go to groups because staff was brainwashing the patients. It was noted that staff and the treatment team will continue to assist AC in learning appropriate ways of managing anger and frustration.

33.    He was, on April 2, 2014, heard to be yelling in his room. He continually expressed themes of being the anti-Christ or being angry with God.

34.    On April 29, 2014 Defendant Dr. Morrow the Unit 26 psychologist wrote: "[AC's] risk of aggression towards others is currently estimated to be "MODERATE" given a history of assaults during this admission.  . . .If any of the above factors change, it is recommended that his risk level be reassessed."

35.    On May 11, 2014 AC told the RN on duty that he stole from his peers so that they would kill him. AC was moved to the front of the dorm for easier viewing while on one-to-one enhanced observation because of suicidal ideation. He was subsequently enrolled in Aggression Reduction group.

36.    On May 22, 2014 Defendant Morrow noted that AC's risk of aggression towards others will remain at "MODERATE" and remain unchanged until further observations can be done on Unit 26. Defendant Morrow advised AC that sessions will be made available to him upon request to assist with emotional and behavioral management.

37.    On May 25, 2014 Dr. Lev Iofis decided to discontinue AC prescription for Olanzapine because of elevated liver enzymes in AC's blood work. Olanzapine is an

— 8 —
**PLAINTIFF'S COMPLAINT FOR DAMAGES**

antipsychotic medication. Defendant Dansereau med with AC on May 27, 2014 at about 12:00pm. He noticed that AC's behavior had become a little bizarre and AC was making reference to God. He decided to prescribe Thorazine, another antipsychotic medication.

38. On May 27, 2014 AC was named by a peer as a person who struck him in the right rib cage area. Three PM staff interviewed AC in the sports room. AC told them that he did not strike the peer. The staff advised AC to remain clear of the peer and he agreed he would. DPS then interviewed AC. AC was then placed into the psych sick call log for May 28, 2014. Defendant Garren, the Unit Supervisor, noted that AC and the peer remain housed in separate dorms and that AC will be evaluated by Unit Psychiatrist Defendant Dansereau during team meeting in the AM shift.

39. Defendant Garren noted that there were no known precipitating events that led to the attack. At the time of the attack the unit acuity was 5.46 with four psychiatric technicians and one RN. The staff was located at the time of the attack as follows: 2 staff in the nursing station, 1 staff in the med room, 1 staff in the dayroom, and 1 staff working with the psychiatrist in the team room.

**Enhanced Treatment Unit – A 2011 Pilot Program at ASH**

40. Pursuant to a pilot program at ASH, which began in 2011, called Enhanced Treatment Unit ("ETU"), chronically dangerous patients who exhibited past violent acts, were placed in secure and locked units. The patients on the ETU were restricted to their unit and were assigned one to a room. The security on the ETU was heightened by several measures including specifically assigned hospital police officers. In spite of his violent past and ongoing acts of aggression towards others, AC was not placed into the ETU.

41. Upon information and belief, several of the patients on the unit in question complained to the staff on Unit 26, including the individually named Defendants and Doe

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

Defendants (psychologist, psychologist, unit supervisor, shift leads, nurses, psychiatric technicians and social workers) that AC was being violent and threatening. However, the staff, including the individually named Defendants and Doe Defendants chose not to do anything.

**May 28, 2014 – AC Wrote a Note:**

42.    Defendant Cecil, the Unit 26 AM Shift Lead, warned staff that they could not meet with AC because it was not safe to be in the same room alone with him. Defendant Cecil told Unit 26 social worker April Grundfor that Unit 26 was too short staffed and not even legal at the time. Cecil stated "He's (AC) not safe to be in a room alone with anyone." Despite his known dangerous state AC was not placed on a one-to-one or even a Q-15 due staff shortage among other reasons (this terminology refers to placing a patient on one to one observation with a staff or on fifteen minute interval visual checks). Defendant Cecil failed to contact the NOD (nurse on duty) to address the staffing shortage. At approximately 12:00 noon in the break room Lead Nurse Barbara Vanhoose was reading a note AC wrote stating that he wanted to harm a staff or another patient. The letter was several pages long and handwritten by AC. Defendant Vanhoose told Grundfor that nursing and psychiatric staff on the floor were aware of the letter.

43.    Grundfor informed Defendant Dansereau of the imminent threat posed by AC. Defendant Dansereau responded with a brief acknowledgment of the problem posed by the recent altering of AC's medication regimen and continued reading his book in reckless and conscious disregard of the safety of AC or others around him.

44.    Grundfor then called the nurse's station on Unit 26 to confirm staff knowledge of the letter's contents and subsequent risk. At approximately 2:00pm a red light alarm sounded and Defendant Dansereau responded. Patients AC and Decedent shared a room. Defendant Cecil and Janitor Mark Rodriguez were restraining AC while Decedent lay on his bed convulsing and gasping for what appeared to be his dying breaths. His face was covered with drying blood.

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

45.     Significantly, the janitor Marty Rodriguez found AC strangling Decedent. Defendant Dansereau, was not the person to find Decedent dying, even though that is what was reported in the media and what he told the detectives.

**Dansereau v. Cecil:**

46.     Defendants Dansereau and Cecil were interviewed by the District Attorney's office after the incident.   Defendant Dansereau told the investigator that he asked Mary Rodriguez to activate his personalized alarm, and then he ran to the nurses station to get help. When he returned, Defendant Dansereau stated that he entered the room, Dorm F, and was followed closely by Defendant Cecil who went straight to AC.  Defendant Dansereau stated that he then turned Decedent over on his back.

47.     Defendant Cecil, however, told the investigator that he walked into AC and Decedent's room and there was no one else there.  Decedent was lying face down and AC was sitting on his bed.  Defendant Cecil stated that he then turned Decedent over, when AC said "I choked him."  He then turned to look in AC's direction and saw Defendant Dansereau standing behind him in the room.  Defendant Cecil instructed Defendant Dansereau to begin CPR while he approached AC.

**AC Pleaded "No Contest" – Life Sentence:**

48.     The next day, AC was arraigned in San Luis Obispo County Superior Court on one count of murder in Decedent's death.  In Jan 2016 AC pleaded no contest and was later sentenced to life in prison.

### FIRST CAUSE OF ACTION

**Reckless Indifference to Civil Rights - 42 USC § 1983**
**(Against All Individually Named Defendants and**
**Doe Defendants in their individual capacity,**
**by Plaintiff in her individual capacity**
**and in her capacity as successor in interest of Decedent)**

— 11 —

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

49.    Plaintiff incorporates by reference and realleges herein each allegation in paragraphs 1 through 48 above.

50.    Plaintiff alleges violations of 42 U.S.C. §1983[1] resulting in both wrongful death damages for her loss of love, affection and society and survival damages due to Decedent's estate for Decedent's pain and suffering prior to death (*See Chaudhry v. City of Los Angeles,* 5/19/2014 holding that CCP § 377.34 denying an estate's ability to recover damages for a Decedent's pain and suffering not applicable to 1983 civil rights actions).

51.    The Government Claim presentation requirements do not apply to a 1983 Civil Rights action (*See Felder v. Casey* (1988) 487 U.S. 131, 134, 108 S.Ct. 2302, 2304-2305)

52.    Decedent was incapacitated and involuntarily committed to ASH a state institution for the mentally ill and, therefore, he has substantive rights under the Due Process Clause of the Fourteenth Amendment to safe conditions of confinement and all individual Defendants had an obligation at all times hereunder to not violate Decedent's and Plaintiff's rights.

53.    Plaintiff alleges that the individually named Defendants and the unknown Doe Defendants violated the due process rights of both Decedent and Plaintiff who is Decedent's mother, because Defendants' judgment resulting in their failure to protect Decedent from AC was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment". *See Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).  The 9th Circuit interpreted the *Youngberg* standard to be the equivalent of conscious disregard

[1]The Supremacy Clause of the U.S. Constitution (Art. VI, cl. 2) protects federal rights from impairment by state rules of procedure. Thus, claims filing requirements of state law cannot defeat a claim arising under federal law.  For example, claims against a public entity based on the Federal Civil Rights Act (42 USCA § 1983) need not be presented to the public entity prior to suit in state (or federal) court. *Felder v. Casey* (1988) 487 U.S. 131, 134, 108 S.Ct. 2302, 2304-2305; *Williams v. Horvath* (1976) 16 Cal.3d 834, 842, 129 Cal.Rptr. 453, 459.

— 12 —

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

amounting to "gross negligence". See *Estate of Conners v. O'Conner* (9th Cir. 1988) 846 F.2 1205, 1208.

54.    All individually named Defendants and the remaining unnamed Doe Defendants whose identify is unknown at this time, while acting under color of law, are being sued here both in their individual and representative capacities, deprived Decedent of his civil rights by violating Decedent's right to life and liberty under the substantive due process of the Fourteenth Amendment.

55.    All individually named Defendants and Doe Defendants whose identify is unknown at this time, while acting under color of law, are being sued here both in their individual and representative capacities, deprived Plaintiff of her civil rights by violating her liberty interest of companionship with Decedent under the Fourteenth Amendment.

56.    The combination of a patient's involuntary commitment and his total dependence on his custodians obliges the individually named Defendants and unknown Doe Defendants to take thought and make reasonable provision for the patient's welfare and safety.

57.    These individually named Defendants, including each one of them and the unknown Doe Defendants, were fully aware of the fact that AC was certified as an MDO, that he had a violent past, that AC's medical chart listed the key indicators to his high risk situations; they knew about his prior violent crimes before arriving at ASH (rape and assault) and about AC's violent incidents during his admission to ASH, in which AC was the aggressor, that adversely affected the safety, care and treatment of other patients, including Decedent. AC's prior aggressive acts were listed in various Special Incident Reports ("SIRs") and in AC's Psychological Risk Assessment.

58.    However, it is alleged upon information and belief that hospital staff have received no training on assessment of patients' potential for dangerous behavior. It is also

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

alleged that the hospital has been glaringly deficient in developing any kind of specialized treatment programs for the exceptionally violent group of patients, like AC, and despite a history of violence among patients at the hospital, the hospital staff made no attempt to rectify the problems.

**Defendant Dansereau's Conscious Indifference to Unsafe Conditions:**

59.     Defendant Dansereau was the Unit Psychiatrist.  He knew that AC was extremely dangerous because of his violent tendencies.  Defendant Dansereau was a member of AC's treatment team, which had the responsibility to identify and discuss patient risk factors and to draft treatment plans that provide for the effective management of the patient's behavior.  AC's treatment team decided not to list his aggressive behavior risk factors and failed to draft a treatment plan that would have provided for the effective management of AC's violent and aggressive behavior.  On May 28, 2014 when he arrived on the unit at about 1:00pm he was told that AC was placed in the psychiatric sick call log due to an assault on another patient the evening before.  He was also told that AC needed to be placed on enhanced observation due to homicidal ideation, but made a decision not to order the enhanced observation.  He also made a decision not to order more staff to the unit, which had an acuity of 5.46 with only five staff members (one RN and five PTs).  Defendant Dansereau also lied to the District Attorney investigator about going to AC's dorm room and finding him on Decedent when it was the staff custodian Rodriguez who found them and triggered his individual alarm.  Defendant Dansereau also lied to the DA's investigator about entering the room and turning Decedent over when it was Defendant Cecil who did it.  Furthermore, a year prior to the incident in question, the nursing station on Unit 26 was moved from a central location (and replaced with the Med Room) in which the dorm rooms were readily visible, to a location (across from the showers) away from a clear line of sight into the dorm rooms.  This created an obvious dangerous situation on Unit 26,

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

which already housed patients who were known to have violent tendencies, where patients were not supervised. Several patients complained stating that violent attacks were occurring out of view of the staff members. However, these complaints were ignored. AC's attack was done out of the view of the nursing station, had it not been moved the staff would have been able to witness and/or hear Decedent's cries for help. His judgment was a substantial department form the standard of care resulting in a violation of both Decedent and Plaintiff's civil rights.

**Defendant Cecil's Conscious Indifference to Unsafe Conditions:**

60. Defendant Cecil was the Unit 26 AM Shift Lead on May 28, 2014. He knew that it was unsafe to be alone with AC, however, he decided not to place him on an enhanced observation and failed to request additional staff due to the increase in acuity on the unit. Upon information and belief, Defendant Cecil was a member of AC's treatment team. He failed to implement the hospital's detailed risk utilization management system, which would have prevented AC from harming Decedent. His judgment was a substantial department from the standard of care resulting in a violation of both Decedent and Plaintiff's civil rights.

**Defendant Morrow's Conscious Indifference to Unsafe Conditions:**

61. Defendant Morrow was the Unit 26 Psychologist. He was a member of AC's treatment team. He decided not to increase AC's violence risk assessment from "MODERATE" to "HIGH". He knew that AC during his admission to ASH from March 6, 2014 until May 28, 2014 was replete with one aggressive act after another. He failed to implement the hospital's detailed risk utilization management system, which would have prevented AC from harming Decedent. He ignored a recommendation by the hospital police to place AC in the ETU. Furthermore, a year prior to the incident in question, the nursing station on Unit 26 was moved from a central location in which the dorm rooms were readily visible, to a location away from a clear line of sight into the dorm rooms. This created an obvious dangerous situation on Unit 26,

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

which already housed patients who were known to have violent tendencies, where patients were not supervised. Several patients complained stating that violent attacks were occurring out of view of the staff members. However, these complaints were ignored. AC's attack was done out of the view of the nursing station, had it not been moved the staff would have been able to witness and/or hear Decedent's cries for help. His judgment was a substantial department from the standard of care resulting in a violation of both Decedent and Plaintiff's civil rights.

**Defendant Garren's Conscious Indifference to Unsafe Conditions:**

62. Defendant Garren was the Unit Supervisor for Unit 26. She was a member of AC's treatment team. Her responsibilities included supervision of psychiatric technicians and related nursing staff; administration of the routine psychiatric and developmental nursing services of a unit; coordinate the work and the staff of a unit and work as a liaison between unit staff on different shifts; and train and develop shift leads and instruct level-of-care nursing personnel in nursing, habilitation, and rehabilitation techniques for developmentally or mentally disordered offenders. She also provided Level I review of all special incident reports, including listing precipitating events, known early warning signs, history impacting the incident, behavior in days prior to the incident, and patient movement. She was also responsible to accurate unit acuity and staffing ratios. Defendant Garren was a member of AC's treatment team and Defendant Garren knew that AC was an ongoing security risk because of his numerous acts of aggression, but she decided not to intervene into the nursing staff's failure to update his level of violence risk assessment that remained on "MODERATE" instead of being changed to "HIGH". failed to implement the hospital's detailed risk utilization management system, which would have prevented AC from harming Decedent. She failed to train and develop shift leads on how to properly determine which patients, such as AC, needed to be removed from the unlocked units and placed into the locked secure units or the ETU. She chose to ignore the Department of

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

Police's recommendation to transfer AC to a locked unit. Furthermore, a year prior to the incident in question, the nursing station on Unit 26 was moved from a central location in which the dorm rooms were readily visible, to a location away from a clear line of sight into the dorm rooms. This created an obvious dangerous situation on Unit 26, which already housed patients who were known to have violent tendencies, where patients were not supervised. Several patients complained stating that violent attacks were occurring out of view of the staff members. However, these complaints were ignored. AC's attack was done out of the view of the nursing station, had it not been moved the staff would have been able to witness and/or hear Decedent's cries for help. Her judgment was a substantial department from the standard of care resulting in a violation of both Decedent and Plaintiff's civil rights.

**Defendant Friend's Conscious Indifference to Unsafe Conditions:**

63.    Defendant Friend was the Director of Program 7. The Program Director is responsible to review all special incident reports. The Program Director is responsible for assigning tasks to the clinical staff to deliver appropriate treatment activities and for ensuring compliance with regulatory standards affecting patient's rights and overall safety. She failed to implement the hospital's detailed risk utilization management system, which would have prevented AC from harming Decedent. She chose to ignore the Department of Police's recommendation to transfer AC to a locked unit. Furthermore, a year prior to the incident in question, the nursing station on Unit 26 was moved from a central location in which the dorm rooms were readily visible, to a location away from a clear line of sight into the dorm rooms. This created an obvious dangerous situation on Unit 26, which already housed patients who were known to have violent tendencies, where patients were not supervised. Several patients complained stating that violent attacks were occurring out of view of the staff members. However, these complaints were ignored. AC's attack was done out of the view of the nursing

PLAINTIFF'S COMPLAINT FOR DAMAGES

station, had it not been moved the staff would have been able to witness and/or hear Decedent's cries for help. Her judgment was a substantial department from the standard of care resulting in a violation of both Decedent and Plaintiff's civil rights.

**Defendant Linda Persons' Conscious Indifference to Unsafe Conditions:**

64.     Defendant Persons was the Executive Director at ASH. She was in charge of the day-to-day operations of the hospital. She was supposed to lead the hospital and fulfill a motivational role for the staff. This included ensuring that staff knew when to transfer a new patient from the acute Admissions Unit to the an intermediate care facility (ICF) (staff ratio in acute is 1:6, whereas in ICF it is 1:8), that staff knew when to place a patient in the high security locked unit or the ETU, that staffing of the units be done according to acuity, which may change during a shift. Violence at ASH, either patient-on-patient or patient-on-staff was habitual because Defendant Persons decided not to. She failed to implement the hospital's detailed risk utilization management system, which would have prevented AC from harming Decedent. Had Defendant Persons fulfilled her duty she would have made sure that a patient such as AC would have been properly evaluated for aggressive acts and placed in the locked units or put on a one-to-one enhanced observation. Her judgment was a substantial department from the standard of care resulting in a violation of both Decedent and Plaintiff's civil rights.

**Defendant Vanhoose's Conscious Indifference to Unsafe Conditions:**

65.     Defendant Vanhoose, was an RN assigned to Unit 26. Unit RN's at ASH administer nursing care to forensic patients; assist in planning and evaluating nursing care of assigned patients; assist in directing and training other nursing service personnel; provide direction to unit or clinic personnel in general or specializes nursing work and provide for continuity of patient care with nursing personnel of other shifts; directing the work of other employees during an eight-hour shift of an organized nursing unit and relieving the supervisor as

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

required.  Defendant Vanhoose was functioning as the enduring member of AC's treatment team and she was to sign off on nursing progress notes.  She knew of AC's extreme propensity towards aggressive and violent behavior.  She failed to implement the hospital's detailed risk utilization management system, which would have prevented AC from harming Decedent.  Specifically, on May 28, 2014 Defendant Vanhoose read the letter AC wrote stating that he was going to harm someone.  Nonetheless, Defendant Vanhoose decided not to place him on enhanced observation.  She went on her lunch break at 1:00pm and did not sign back in.  There was no other RN on the unit during her lunch break.  Her judgment was a substantial department from the standard of care resulting in a violation of both Decedent and Plaintiff's civil rights.

**Defendant Thompson's Conscious Indifference to Unsafe Conditions:**

66.    Defendant Thompson was the Health Services Specialist is responsible for the ongoing monitoring, assessing, and making of recommendations for the maintenance of quality nursing services with primary emphasis on the physical care needs of patients in a program on an assigned shift; assures education and training in nursing care is provided to unit personnel; and performs other related duties.  Defendant Thompson the HSS failed to assure the proper education and training in nursing care was provided to Unit 26 personnel.  Specifically, she failed to make sure that the unit personnel knew how to properly determine when a patient needed to be placed on enhanced observation due to Danger to Others (DTO) or how to identify specific triggers to aggressive behavior or how to document those triggers so that others may identify them.  She failed to implement the hospital's detailed risk utilization management system, which would have prevented AC from harming Decedent.  Furthermore, a year prior to the incident in question, the nursing station on Unit 26 was moved from a central location in which the dorm rooms were readily visible, to a location away from a clear line of sight into the dorm rooms.  This created an obvious dangerous situation on Unit 26, which already housed

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

patients who were known to have violent tendencies, where patients were not supervised. Several patients complained stating that violent attacks were occurring out of view of the staff members. However, these complaints were ignored. AC's attack was done out of the view of the nursing station, had it not been moved the staff would have been able to witness and/or hear Decedent's cries for help. She used poor judgment in these failures, and placed Decedent in imminent danger of great bodily harm. Her judgment was a substantial department from the standard of care resulting in a violation of both Decedent and Plaintiff's civil rights.

**Defendants Cassidy, Fain, Erika Cooks, and Heidi Cooks' Conscious Indifference to Unsafe Conditions:**

67.    Defendants Cassidy, Fain, Erika Cooks and Heidi Cooks were psychiatric technicians assigned to the AM shift on Unit 26. Psych Techs at ASH provide a basic level of general behavioral and psychiatric nursing care and are expected through their attitude, knowledge, and performance to facilitate the rehabilitation of forensic patients. These four Defendants were familiar with AC's aggressive and violent outbursts. Specifically, on May 28, 2014 they were on Unit 26 when Grundfor, the Unit Social Worker, notified them that AC had written a letter stating that he was going to physically hurt someone. They were aware that Defendant Cecil said that it wasn't safe to be alone with AC. They had a responsibility to intervene according to AC's treatment plan in order to prevent future harm to others, but they decided not to do anything. The failed to thoroughly evaluate and assess AC for any and all tendencies for aggressive acts. They failed to check on AC every 30 minutes, they failed to determine that AC needed enhanced observation, they failed to notify their supervisors that they were short staffed, and they failed to increase the unit acuity due to AC's aggressive behavior. They acted with a conscious disregard to the substantial likelihood that AC would harm

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

someone.  Their judgment was a substantial department from the standard of care resulting in a violation of both Decedent and Plaintiff's civil rights.

68.   These failures of the individually named Defendants and each one of them and the unknown Does Defendants placed Decedent in imminent great bodily danger and were a proximate cause of his Death and Plaintiff's harm.

69.   These specific failures done by these individually named Defendants, and the unknown Doe Defendants, were done with reckless indifference to the health and safety of Decedent, and were a substantial departure from the standard of care and were a direct and proximate cause of the violation of Plaintiff and Decedent's constitutional rights and resulting harm.

70.   Plaintiff is informed and believes and thereon alleges that all acts or omissions alleged to have been engaged in by the individually named Defendants and Doe Defendants are alleged to have been engaged in with reckless indifference, evil motive and intent, and/or in callous, reckless, and wanton disregard to the rights of Decedent and Plaintiff, thereby justifying the awarding of punitive and exemplary damages against all individually named Defendants.

71.   As a result of the individually named Defendants' conduct, including the Doe Defendants, as alleged herein, Plaintiff is entitled to attorneys' fees pursuant to 42 U.S.C. §1988.

72.   WHEREFORE Plaintiff prays for relief as hereinafter set forth.

### SECOND CAUSE OF ACTION

**Abuse of Dependent Adult – Welf & Inst Code § 15610.57**
**(As to All Individually Named Defendants (except Persons)**
**and Doe Defendants)**

73.   Plaintiff refers to and realleges paragraphs 1 through 72, inclusive as though set forth fully herein.

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

74.    In 1999 Decedent began residing at ASH.  Decedent was set to be released from ASH in or about September 2015.  Defendant ASH was entrusted with the sole custodial care of Decedent, but failed through the reckless misconduct of the individually named Defendants and the Doe Defendants to protect Decedent's health and safety, in violation of Welf & Inst Code Sections 15610.63   physical abuse,   and 15610.57 neglect (failure to protect the safety of Decedent).

75.    As discussed above, the individually named Defendants and unknown Doe Defendants had particular knowledge of patient AC's violent behavior.

76.    As a proximate result of the individually named Defendants and the remaining Does Defendants reckless abuse and neglect of Decedent, a dependent adult, as described above, Decedent died on or about May 28, 2014.

77.    The individually named Defendants' reckless neglect and abuse of Decedent as defined by Welf & Inst Code § 15610.57 amounts to wrongdoing pursuant to the Elder Abuse and Dependent Adult Civil Protection Act entitling Plaintiff to recover enhanced damages pursuant to Welf & Inst Code §15657 since it is alleged that by clear and convincing evidence the individually named Defendants are guilty of recklessness, oppression, fraud or malice in the commission of the abuse of Decedent.

## THIRDS CAUSE OF ACTION

**Wrongful Death**
**(As to All Individually Named Defendants (except Persons)**
**and Does Defendants**

78.    Plaintiff refers to and realleges paragraphs 1 through 77, inclusive as though set forth fully herein.

79.    While Plaintiff alleges that Defendants acts and omissions detailed above amounted to reckless indifference and neglect of a dependent adult (both Civil Rights violations

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

and Adult Dependent Abuse), Plaintiff pleads in the alternative that the individually named Defendants and each of them, at a minimum, negligently and carelessly cared for Decedent.

80.    As it has been described above, the individually named Defendants failed to protect Decedent from AC and thereby breached their duty of reason care.  It was foreseeable that Decedent would be harmed by the actions of the individually named Defendants and each of them and that he was harmed as a proximate result of their actions and omissions.

81.    As a proximate result of the professional negligence of the individually named Defendants, and each of them, AC attacked Decedent and Decedent died on or about May 28, 2014.

82.    As a proximate result of the negligence Plaintiff has sustained general damages resulting from the loss of love, affection and society of Decedent in an amount to be determined at trial.

83.    By virtue of the foregoing, Plaintiff sustained damages in a sum according to proof.

WHEREFORE, Plaintiff prays for the following relief:

PRAYER

1.    For special damages according to proof;

2.    For general damages according to proof;

3.    For costs of suit and attorneys' fees herein incurred and punitive damages pursuant to section 1983;

4.    For costs of suit and attorneys' fees herein incurred pursuant to Welf & Inst Code §§ 15657 et seq.;

5.    For pre-judgment and post-judgment interests, if any, incurred; and

6.    For such other and further relief as the court may deem proper.

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

Dated: May 31, 2016                    LAW OFFICES OF DAVID FELDMAN


_____
David Feldman
Attorney for Plaintiff


### RIGHT TO TRIAL BY JURY

1.      PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY.


Dated: May 31, 2016                    LAW OFFICES OF DAVID FELDMAN


_____
David Feldman
Attorney for Plaintiff

**PLAINTIFF'S COMPLAINT FOR DAMAGES**